879 P.2d 60 (1994)
110 Nev. 1009
Adrian Ricardo SMITH, Appellant,
v.
The STATE of Nevada, Respondent.
No. 24752.
Supreme Court of Nevada.
August 10, 1994.
*61 Patricia Erickson, Las Vegas, for appellant.
Frankie Sue Del Papa, Atty. Gen., Carson City, Rex Bell, Dist. Atty., James Tufteland, Chief Deputy Dist. Atty., Douglas Herndon, Deputy Dist. Atty., Clark County, for respondent.

OPINION
SPRINGER, Justice:
Appellant Adrian Ricardo Smith (Smith) was charged with one count each of first degree murder, robbery and attempted sexual assault.
Smith pleaded guilty to first degree murder and signed a formal written pleading prepared by the district attorney's office, called a "Guilty Plea Memorandum," in exchange for the State's dismissal of the robbery and sexual assault charges and for the State's promise not to seek the death penalty. The transcript of the guilty plea canvass clearly reveals that Smith's plea is the result of coercion rather than being an informed and voluntary decision. See NRS 174.035(1); Hanley v. State, 97 Nev. 130, 624 P.2d 1387 (1981). The plea canvass pretty much speaks for itself. The Guilty Plea Memorandum does not validate Smith's guilty plea to premeditated, first-degree murder.[1]

PLEA CANVASS
The guilty-plea proceedings begin with the court's advising Smith that he "could receive a penalty of death" and asking him if one of the reasons that he was pleading guilty to first degree murder was "to avoid the possibility of ... a sentence of death." Smith replied in the affirmative.
The court then asked Smith if on November 17, 1990, he and some other person had taken "Nancy Sheffield and really beat her to death and strangle[d] her?.... And, at that time, was she killed?" Smith's answer was "Not in my presence, sir." When asked again if he and another person "had ... been engaged with him in beating her up at that time," Smith's answer was again, "No, Sir." Pressing on, the court asked, "You didn't hit her?" Smith's answer: "No, sir." Further, "You didn't choke her?" Answer: "No, Sir."
The foregoing colloquy caused the court to redirect its questions, and Smith was asked: "Did you know that he was going to kill her?" Smith's answer was that although he knew the killer was "pretty mad," he "didn't know what he [the killer] was going to do." When asked by the court, Smith denied that he had had a "pretty good idea he was going to beat her up and kill her."
It was very apparent that the district judge was making no progress in trying to get Smith to admit that he had killed someone  even if by doing so he might avoid the "possibility" of a death sentence. This stalemate called for a conference between Smith and his lawyer so that his lawyer could explain to him what he had to say if he was going to avoid the possibility of death. Smith's lawyer: "[C]an we have the Court's indulgence for just a moment?"
Back on the record, on a new tack:
THE DEFENDANT: He did say he was going to kick her ass, but he didn't say when or where.
THE COURT: And when he said he was going to kick her ass, what did that mean to you?
THE DEFENDANT: He was just going to push her around like everybody else.
THE COURT: By push around, you mean he was going to kill her?
THE DEFENDANT: No  okay, a lot of incidents happen around that area. A lot of men and women get socked up and *62 go about their business, about on their marry[sic] way.
THE COURT: When you say socked up. do you mean killed?
THE DEFENDANT: Beat up or, you know, shot or whatever.
THE COURT: See, we have got a woman here that was not only beat up, she was strangled to death. So she didn't die because she was beat up. She was strangled to death.
THE DEFENDANT: Yes, sir, I understand that.
THE COURT: And the evidence that's presented here and the evidence that would continue to be presented here is that you strangled her.
THE DEFENDANT: No, sir, I didn't.
THE COURT: What are you pleading guilty for?
THE DEFENDANT: So I won't get the death penalty for something I didn't do.
The foregoing, obviously, called for another off-the-record conference between Smith and his lawyer. His lawyer then advised the court that Mr. Smith was finally "prepared to continue with his explanation as to what happened that morning." After conferring with his attorney Smith had a new "explanation as to what happened." The new and as yet untried "explanation" was that Smith led the victim to her slaughter. Smith then became willing to tell the court that he "got her to come outside so Sixty [the murderer] could beat her up and I left." Now we might be on to something. The Court pursued it: "Was he just going to beat her up?" Disappointingly, Smith responded, "Yes, sir." Asked further, "No kill?", Smith replied, "No kill." This clearly called for another instructional, off-the-record conference between Smith and his attorney. The court is getting impatient: ".... I'm not sure whether I should allow the guilty plea without an admission of first degree murder and that includes an admission that there was an added mixture of premeditation, deliberation, that there was malice aforethought and a willful killing of Nancy Sheffield at that day and time." This remark called for a fourth off-the-record attorney-client conference.[2]
In the next stab at trying to get Smith to admit he was an absentee first degree murderer, the prosecutor lent a hand. Felony murder looked like it might be a good way to go; so the district attorney made this suggestion to the court: "[I]f there was an admission that a felony took place during the course of the killing or shortly thereafter or before the killing of Ms. Sheffield, the robbery or attempted sexual assault, I think that would satisfy first degree murder under the felony rule." This sounded like a pretty good idea, so the court pursued this in its fifth canvass of Mr. Smith.
THE COURT: Was there a robbery or sexual assault at this time?
THE DEFENDANT: Uh?
THE COURT: I asked was there a robbery or sexual assault at this time?
THE DEFENDANT: No, sir.
THE COURT: Nobody reached in her vagina to look for money.
THE DEFENDANT: Not in my presence.
THE COURT: Nobody took anything from her?
THE DEFENDANT: Not in my presence.
THE COURT: I think we are playing a game here.
THE DEFENDANT: It ain't no game.
The try at a felony-murder admission did not work. This called for another off-the-record instructional session. Let's try aiding and abetting on the sixth try. By now Smith was ready to say anything.
THE DEFENDANT: I aided him in doing it.
THE COURT: How did you aid him in doing it?
THE DEFENDANT: By going out there.
THE COURT: By getting her to come outside?
THE DEFENDANT: Yes, sir.

*63 THE COURT: When you got her to come outside, did you have reason to believe that he was going to rob her or sexually assault her or kill her?
THE DEFENDANT: Well, robbery and sexual assault, no. Kill, it's hard to say.
THE COURT: Well, if you didn't believe that he was going to kill her, then you didn't aid and abet, did you?
THE DEFENDANT: I did bring her outside.
THE COURT: Did you bring her outside realizing that she would probably be robbed or sexually assaulted or killed?
THE DEFENDANT: Probably killed.
THE COURT: You believed that she would probably be killed.
THE DEFENDANT: Yes, sir.
THE COURT: And you want to enter this plea of guilty to first degree murder that carries a minimum of life with the possibility of parole sentence so you are precluded from having any death penalty being imposed on you; is that right?
THE DEFENDANT: Yes, your Honor.
Smith testified clearly that it was "hard to say" whether he "had reason to believe" that the victim might be killed by "Sixty." Finally they got Smith to admit that he "believed that she would probably be killed." After all that pulling and tugging the most that Smith would ever admit is that when Sixty took some one out, there was a probability of death in the offing. The plea canvass is clearly insufficient to support a plea of premeditated first degree murder. Smith's plea was the result of extended "coaching" by all concerned, including the district court. "[J]udicial involvement in plea negotiation inevitably carries with it the high and unacceptable risk of coercing a defendant to accept the proposed agreement and plead guilty." United States v. Bruce, 976 F.2d 552, 556 (9th Cir.1992). If this plea is to stand, it can only stand on the basis of a written Guilty Plea Memorandum which Smith signed.

GUILTY PLEA MEMORANDUM
The Guilty Plea Memorandum is a formal pleading signed by Smith, his attorney and a deputy district attorney. In the document prepared for Smith and signed by him, Smith states that he understands the nature of the charges and that by pleading guilty he admits "the facts which support all the elements of the offense(s) to which I now plead." No mention of dropping the death penalty is made, but the document does indicate that Smith's plea is "voluntary and not the result of any threats, coercion or promises of leniency [such as no death penalty]." The formal Guilty Plea Memorandum was a mere "boiler plate" formality that is completely inconsistent with the court's canvass discussed above. Given the gross deficiencies of that canvass, Smith's signing of this document cannot supersede what he told the court face-to-face.
Smith's guilty plea is ordered set aside, and the case remanded for further proceedings consistent with this opinion.
ROSE, C.J., and STEFFEN and YOUNG, JJ., concur.
SHEARING, Justice, concurring:
I concur in the result.
NOTES
[1] Although we stated in Bryant v. State, 102 Nev. 268, 721 P.2d 364 (1986), that this court will not consider a challenge to the validity of a guilty plea unless the defendant first brings his or her challenge in the district court, this rule cannot be applied without exception. In cases such as this one where the error clearly appears from the record, it is a waste of judicial resources to require the defendant to start the process of review anew. Compare Lyons v. State, 105 Nev. 317, 319, 775 P.2d 219, 220 (1989).
[2] At this point the prosecutor concedes that the State is not satisfied with the plea canvass.